**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01216-MSK-KM T

**Carolyn Jean Gissendanner Borwick**

Plaintiff,
v.

**University of Denver , Board of Trustees**
**University of Denver Graduate School of Social Work,**
**Chancellor Robert Coombe,** in his official capacity**,**
**Gregg Kvistad,** individually and as Denver University Provost,
**Dr. James R. Moran, PhD**, individually and as Professor of the Graduate School of Social Work **,**
**Barbara Wilcots**, individually and as Associate Provost for Graduate Studies,
**Dr. Walter LaMendola**, PhD, individually and as Professor and Director of the Doctoral Program of the Graduate School of Social Work,
**Dean James Herbert Williams,** individually and as Dean of the Graduate School of Social Work, and
**Dr. William Cloud**, individually and as Professor of the Graduate School of Social Work,

Defendants:

---

**AMENDED VERIFIED COMPLAINT AND JURY DEMAND**

---

Plaintiff, by their attorney, Derry Dale Sadler and the Sadler Law Office, for her amended and previously verified complaint against Defendants states and avers as follows:

## I. NATURE OF THE ACTION

1. Plaintiff , Carolyn Jean Gissendanner Borwick was a full-time student and candidate for a PhD at Denver University Graduate School of Social Work.

Defendants discriminated against Plaintiff on the basis of her disability (mental and physical impai as is. I should understand is as so as is his causing as he is on your verdict and crucified as long as it read why her out rments), when among other things, Plaintiff was not provided reasonable accommodations. Plaintiff was subjected to disparate treatment and retaliated against after participating in the Department of Education Office of Civil Rights process. Additionally, Defendants' practices and separate treatment had a disparate impact on Plaintiff, as a disabled student.

2. Plaintiff brings this action to address and receive satisfaction for injuries resulting from the denial of civil rights, equal educational opportunities, breach of contract and implied breach of contract based upon the physical and emotional disabilities of Plaintiff, in violation of Section 504 of the Rehabilitation Act of 1973 (as amended), Title III of the Americans With Disabilities Act, 42 U.S.C. §2000a , the Colorado Civil Rights Act, C.R.S. §24-34-402, 42 U.S.C. §1983 and the Civil Rights Act of 1991, as hereinafter more fully appears. In doing the things, defendants acted under color of Colorado State educational laws.

3. Plaintiff is an African-American female resident of the State of Colorado who was over the age of 40 when she began her doctoral studies.

## II. JURISDICTION AND VENUE

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. § 1367 (supplemental questions), 29 U.S.C. §794a, 42 U.S.C. §2000a and 42 U.S.C. §12117(a).

5. This action arises under the United States and Colorado Constitutions, the 14th Amendment to the United States Constitution, the Civil Rights Act of 1870, 42 U.S.C. §1981, 42 U.S.C. §1983, 42 U.S.C. §2000a, the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act and the Colorado Civil Rights Act, C.R.S. §24-34-402.

## III. ADMINISTRATIVE PROCEDURE

6. Plaintiff made a reasonable effort to mitigate damages and exhaust administrative remedies as set forth herein;

| Date | Activity |
|---|---|
| April 17, 2001 | First request for accommodation/academic extension, approved by Dr. Carole Fee Ivanoff, Students Services |
| 2007 | Second request/First Extension of time, approved by Dr. Jim Moran, Vice Provost |
| 2008 | Third request/Second Extension of time, approved by Dr. Jim Moran, Vice Provost |
| 2009 | Fourth request/Third Extension of time, approved by Dr. Barbara Wilcots, Vice Provost with the caveat of no further extensions which precluded further filings for rights to accommodations. |
| August 17, 2009 | Complaint to U.S. Dept. of Education, Office of Civil Rights Case No. 08092131 |
| July 12, 2010 | GSSW Appeal to James Williams, PhD, Dean |
| July 20, 2010 | Appeal to GSSW-Ad Hoc Appeals Committee |
| August 12, 2010 | Student Appeal to Provost Gregg Kvistad |
| January 18, 2011 | Filed Public Accommodation Colorado Civil Rights Division Public Accommodation Complaint, and Appeal to DU, GSSW and Colorado Department of Higher Education |
| March 17, 2011 | Plaintiff's Notice of Intent to Sue |

7. Exhaustion of administrative remedies is not required under Title III.

8. This action is commenced within the relevant statutes of limitations for each cause of action alleged herein.

## IV. PARTIES

9. Plaintiff was and at all relevant times, is a citizen of the United States and a resident of the State of Colorado.

10. Defendant University of Denver ("DU") is a private university that has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, as defined by 42 U.S.C. §12111 (5).

11. DU is an educational institution run by its Board of Trustees, with its principal place of business at 2199 S. University Blvd., Mary Reed building, Denver, Colorado, 80208. As a nationally known educational institution, it provides educational services that impacts national and international commerce. It operates under and is subject to Colorado higher education laws.

12. DU and Denver University of Denver Graduate School of Social Work ("GSSW") are educational institutions and departments of (respectively), with 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. Plaintiff believes that DU has more than 500 employees.

13. GSSW is an educational unit of DU, with its principal location at 2148 S. High St., Denver, CO 80208.

14. Upon information and belief, Defendants DU and GSSW are recipients of federal financial assistance or operate programs which are recipients of federal funding.

15. Robert Coombe is employed by DU Board of Trustees, as Chancellor and is equivalent to a chief operating officer for the purpose of the implementation of

institutional board policies, administrative procedures and other decisions impacting diversity and equal academic opportunities, under color of state and federal laws.

16. The University of Denver is administered by a Chancellor, Provost, Vice Provost, Associate Provost, Deans, Chairpersons of Doctoral programs, and their staffs (professors, associate and assistant professors and support staffs). The staffs of the University may serve on ad hoc committees and/or act as student advisors. The Graduate School of Social Work (GSSW) is one school on the University of Denver campus.

17. The University of Denver and the GSSW have the responsibility of admitting students based upon an established set of guidelines and procedures, providing equitable, high quality education to all students, and to provide reasonable accommodations to eliminate institutional barriers through educational program administrative procedures to equalize the opportunity of success of all students. They also have power to terminate students from educational graduate studies based upon standardized rules and procedures that are applicable to all students.

18. Gregg Kvistad, is a resident of the State of Colorado and employed as University of Denver as Provost. The Provost is the final authority in the appeal process.

19. Barbara Wilcots, is a resident of the State of Colorado and employed by GSSW as an Vice Provost. Dr. Wilcots began as Associate Provost in 2009.

20. Dean James Herbert Williams is a resident of the State of Colorado and employed as Dean of the GSSW. Dr. James Herbert Williams began as Dean of the GSSW in June 2007.

21. Dr. Walter LaMendola, PhD, is a resident of the State of Colorado and employed by GSSW as Director of the Doctoral Program. Dr. La Mendola began as the Director of the Doctoral Program in approximately 2006-7.

22. Dr. William Cloud, PhD, is a resident of the State of Colorado and employed as Professor in the Graduate School of Social Work. Dr. Cloud served as Mrs. G-Borwick's academic advisor/dissertation chair from 2005-2009.

23. Dr. James R Moran, PhD is a resident of the State of Colorado and employed as a professor of the GSSW and former Vice Provost. Dr. Moran served as Mrs. G-Borwick's first academic advisor (2000-2001) and final academic advisor, dissertation chair from (November 2009-June 2010).

24. At all times relevant to this complaint, all of the above-named parties were citizens of the United States and residents of the State of Colorado, and all defendants acted intentionally, knowingly, with willful and wanton intent to discriminate and separate Plaintiff from the GSSW program, solely based on her mental and physical disabilities.

## V. GENERAL ALLEGATIONS

25. Carolyn Jean Gissendanner Borwick (hereinafter "Plaintiff"), is a 60-year-old disabled African American female candidate for a social work doctoral degree at the University of Denver, School of Graduate Social Work.

26. Plaintiff received her Master's Degree in Social Work, from the University of Denver, Graduate School of Social Work in 1999. Plaintiff's pre-doctoral academic credentials qualified her to apply and participate in the Denver Graduate School of Social Work ("GSSW") doctoral program because she received superior grades and a Master's Degree in Social Science and demonstrated evidence of practical professional experience in the social work field.

27. Plaintiff has a superior academic record in all previous work. She possesses the maturity, intellectual ability, commitment and readiness for advanced graduate study. Plaintiff has at least 2 years of Masters Degree practice. She is proficient in descriptive and inferential statistics, qualitative and quantitative analysis.

28. Plaintiff was accepted for the Denver University Graduate School of Social Work PhD program and began her doctoral studies in the academic year of 2000.

29. Plaintiff was involved in an automobile accident on April 1, 2001. Plaintiff became physically disabled, following a rear end collision automobile accident that occurred on April 2, 2001. Plaintiff was the driver of a four-door Toyota Camry that was stopped for a red light. Her automobile was rear-ended by a tow truck. The rear end collision pushed her automobile into the car in front of her. After the second impact, Plaintiff's airbags deployed. From the accident, Plaintiff received injuries to her neck and multiple contusions/abrasions to her arms and right leg. Plaintiff suffered a ruptured cervical disc, herniated disc, a dislocated right shoulder, right leg strain and injury, post trauma stress disorder and closed

head injuries, resulting in confusion. She was taken by ambulance to Swedish Hospital in Denver, CO. Plaintiff required two (2) surgeries and multiple medical interventions to deal with the immediate impact of the automobile accident. Following the accident, she took approximately 2 months to heal from the abrasions and mental confusion. The first surgery in the year 2002, required 3 months of recovery time and the 2nd surgery, in the year 2003-4, required 1 ½ years of recovery time. She was advised of the need for subsequent surgeries in 2004-2006. She was told that she needed a rotator cuff surgery and a surgery to repair the failed initial spinal surgery.

30. On April 3, 2001, Plaintiff presented to Kaiser Permanente with complaints of cervicogenic headaches, neck and back pain. She experienced right leg swelling. She was diagnosed with headaches, muscle strain and a subcutaneous cyst. On April 10, she presented to Dr. James Wilk, M.D. with complaints of headaches, back and neck pain and driving related stress. She was given conservative treatment and referred to Dr. Dievorst, PhD for the driving anxiety..

31. On or about April 17, 2001 (16 days after the automobile collision) and at subsequent intermittent times thereafter, Plaintiff requested that the Dean or designated authority to allow reasonable accommodations in the form of incompletes ("INC") or academic deadline extensions to complete her doctoral coursework. Dr. Stephen Shogan, neurosurgeon wrote to the University of Denver, Graduate School of Social Work to support the need for accommodations and to document the problems encountered as a result of the automobile accident.

32. On April17, 2001, Dr. Carole Ivanoff, the designated student services staff person for students with disabilities at GSSW, wrote to Drs' Wise, Jenson, Whitsell, Green and Govenor Richard Lamm to confirm the need for accommodations. Three of the professors issued incompletes to meet her need for accommodations; this is documented on her official transcript.

33. On June 26, 2001, Plaintiff presented to Rose Medical Center. For an MRI of her cervical spine. The MRI confirmed spondylolisthesis in the cervical region, with foraminal stenosis, cervical spondylolisthesis and intervertebral osteochondrosis.

34. On August 2, 2001, after a series of epidural injections and acupuncture treatment, Plaintiff reported continual neck pain and scapular thoracic area pain, with tingling in her left arm and hand. On August 7, 2001, Dr. Stephen Shogun, M.D. recommended epidural steroid injections in the cervical region.

35. On March 27, 2002, Plaintiff returned to Rose Medical Center for another MRI of her cervical spine to be used for comparison of her June 26, 2001 cervical spine MRI. The second MRI confirmed, degenerative disc disease, had C-4 through C7 levels, evidence in a mild spinal stenosis at the C- 6 level, secondary to bony spurring, as well as central and paracentral and lateral focal disc protrusion, impinging upon the ventral nerve root. At this level. The radiologist noted that the changes that C- 6 have progressed significantly. When compared to the previous examination.

36. Dr. Karl Stecher, Jr., M.D., an independent medical examiner, was requested by Geico Insurance, to provide an independent opinion regarding

Plaintiff's ongoing pain and suffering. The doctor opined that Plaintiff's injuries were 100% related to the April 2, 2001 automobile incident. It was confirmed that Plaintiff suffered damage to her cervical discs at C3-4 and C4-5, with spurring at C-4-5 on the right side.

37. On April 17, 2002, Plaintiff underwent surgery at Rose Hospital for interior cervical disc and spur removal with fusion of the C-4-5 and C- 6.

38. On October 24, 2002, it was discovered that the cervical fixation screws were changing position. On October 29, 2002. It was discovered that a screw was coming off the cervical site in her neck from the anterior part of the vertebrae. Plaintiff continued to endure severe pain to neck pain, posterior shoulder girdle pain, residual right-sided lower back pain and headaches through June 23, 2003, as noted by Dr. Shogun. Dr. Shogun recommended another MRI of the cervical spine.

39. On June 9, 2003, it was discovered that Plaintiff received glenohumeral instability from the trauma of the accident. On August 11, 2003, Dr. James McElhinny, M.D., noted glenohumeral instability. An October 7, 2003 MRI of the right shoulder revealed a of contrast material under the surface of the tendon suggesting either a partial thickness tear or tendinitis. At 52 years old, she underwent post anterior shoulder reconstruction (open surgery) on November 21, 2003.

40. On July 2, 2003, the Rose Medical Center MRI confirmed degenerative changes above the fusion at C3-4, producing an annular disc bulge. Had C4- 5,

there were posterior osteophytes in the a left paracentral/lateral position of the spinal cord area encroaching upon the left neural foramen .

41. On January 6, 2004, Dr. Wilk, M.D. updated the permanent diagnosis to cervical injuries, headaches, cervical strain, lumbosacral strain, contusions of the right anterior shin and bilateral forearms, driving phobia, scapulothoracic, cervical degenerative disc disease with canal stenosis and cervical radiculopathy.

42. During the course of her recovery, Plaintiff attended 45 physical therapy sessions with Bruce Taylor, MSPT, from January 22, 2003 through September 22, 2003; eight acupuncture sections that Denver injury evaluation and treatment Center from September 6, 2001 through December 20, 2001; 49 physical therapy sessions at Denver injury evaluation and treatment Center from April 18, 2001 through January 29, 2004; 30 massage therapy sessions at Denver injury evaluation and treatment Center from April 20, 2001 through October 16, 2002; one chiropractic session with Richard Kronene, DC, one massage therapy session with Kathy R. Oliphant-Justice, CMT. On March 28, 2002; 94 physicals, eight acupuncture sessions, several post trauma stress disorder treatments and trigger point injections. Plaintiff received continued treatment for headaches. The pain and suffering from the automobile incident contributed to delays in the completion of written PhD program academic work.

43. From April 3, 2001, through and including the academic year of 2009/10, Plaintiff suffered with continual pain, posttraumatic stress, and anxiety. The Plaintiff was informed in October 2008 that she needed to have a surgery to correct the dislodged screw and to remove a bone spur that was causing serious

problems. She informed her advisor, Dr. William Cloud in writing, October-November 2008 that she was having difficulties and would need another surgery. She was unable to work on her dissertation because of the pain and lack of focus. The surgery was scheduled and completed April 22, 2009. She took time away from work and school during 2009. Her neurosurgeon, Dr. Stephen Shogan wrote that "she was not able to write her dissertation in 2009". Plaintiff continues to experience permanent injuries and neck pain associated with the April 2001 automobile accident.

44. Plaintiff's impairments affect major life activities, including, but not limited to performing manual tasks, walking, this being, reaching, standing, stooping, twisting, climbing, bending, squatting, kneeling, sleeping, and concentration, among other things.

45. Plaintiff is able to perform the essential functions required to complete the dissertation program.

46. Plaintiff is a qualified individual with a disability , as defined by §101 (8) of the Americans with Disabilities Act, 42 U.S.C. §12111 (8).

47. Plaintiff qualifies as an American with a physiological and psychological disability, as defined by the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 (a) (1)) and section 504 of the Rehabilitation Act as amended 1999 (29 U.S.C. §705 (20) (A) and (B)).

48. Plaintiff was and currently is qualified to complete her doctoral dissertation, with reasonable academic accommodations, notwithstanding her known physical disabilities and related emotional stress challenges.

49. Since April 17, 2001, and at all other times relevant to this case, Defendants were aware of Plaintiff's disabilities and requests for academic accommodations.

50. Any reasonable accommodation that would be necessary to enable Plaintiff to perform the essential functions required to complete the dissertation program would not have imposed an undue hardship on the Defendants within the meaning of §101 (10) of the Americans with disabilities act, 42 U.S.C. §12111 (10).

51. Plaintiff faced additional delays in completing her dissertation work, based upon her association and responsibilities to the elderly disabled. During the critical time of organizing dissertation logistics, Plaintiff met with certain deadline emergencies that required her to choose between having to request another extension and tending to the life threatening circumstances of her elderly disabled mother, Ms. Lenola Lawrence (DOB: 7/23/1934). Ms. Lawrence was the victim of elder abuse, by an institution of trust in the State of California. The abuse led to the citation of Lemon Grove Care, a skilled nursing facility. The nursing facility failed to assess a change in the skin condition of Plaintiff's mother, from January 2010, through and including June 15, 2010. This resulted in a series of emergency operations, including amputation of extremities. Plaintiff was compelled to interrupt her studies in order to make life changing and life-saving medical care decisions for her disabled mother.

52. On June 13, 2010, Ms. Lawrence had to be hospitalized, intubated and isolated for infectious wounds. By June 15, 2010, Plaintiff had made a decision to

consent to the amputation of her mother's lower right extremity. While hospitalized, medical staffs transfer procedures caused a fracture in Ms. Lawrence’s left leg. She was treated with a second surgery which placed a rod into her left leg to relieve pain and contain certain movements. Ms. Lawrence suffered a cardiac arrest after the second surgery and was revived with CPR. Ms. Lawrence was not expected to survive and the Plaintiff was called to make final arrangements for her mother. After consultation with an infection specialist, the Plaintiff was informed that the infection was caused by bed sores and her mother’s impending death was caused by elder abuse/neglect and the lack of medical care rather than natural causes.

53. On June 18, 2010, Plaintiff was advised that her mother was being moved to intensive care. Plaintiff had to travel to San Diego California to be at bedside and make vital decisions, including whether to allow her mother to pass away. Because the injury was caused by elder abuse/neglect the plaintiff decided to make life saving decisions for her elderly disabled mother rather than allowing her to die. During that time she received the decision from the Dean James Herbert Williams, July 12, 2010 that are advising Plaintiff that she would be permitted to appeal her termination.

54. The Dean of the GSSW appointed an ad hoc committee to hear the appeal case. The ad hoc committee had several weeks to make a decision. The results included a statement that the Plaintiff was offered a medical stop in 2009 and did not accept it. The ad hoc committee did not seek information outside of what was presented by the Dean, James Herbert Williams. They were not informed of the

Plaintiffs' prior approval for accommodations. Nor did they comment on the issue of the Plaintiffs affiliation with a person with a disability. Plaintiff was not offered a full and fair hearing doing the ad hoc committee review process.

55. Despite these extraordinary disabling circumstances, and despite Plaintiff's timely request for reasonable and cost-effective accommodations, the Plaintiff was administratively terminated, on July 23, 2010.

56. On August 12, 2010, Plaintiff filed an appeal with the University Provost, pursuant to the University of Denver, Graduate School of Social Work PhD Program Handbook. According to the handbook, the University Provost may refer the appeal to the Graduate Counsel for its recommendation. Rather than refer the appeal to a Graduate Counsel, the University Provost referred the matter back to the Vice Provost, Barbara Wilcots, PhD who made the original decision regarding not extending accommodations and extensions of time to Ms. Gissendanner Borwick after the third extension.

57. The Defendant parties consorted, collaborated and agreed amongst themselves to separate Plaintiff from the GSSW doctoral program, solely or primarily based upon Plaintiff's disability and Plaintiffs association with her disabled mother, Lenola Lawrence.

**FIRST CAUSE OF ACTION—DISCRIMINATION IN PUBLIC ACCOMMODATION ON BASIS OF DISABILITY**

42 U.S.C. § 12181-12189

58. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs marked 1 through 57 with the same force and effect as if more fully and at length set forth herein.

59. After the April 1, 2001 automobile accident, Plaintiff requested reasonable accommodations to permit her to continue her educational goal of receive in a doctoral degree. She was referred to the graduate school of social work student services staff person, Dr. Carol C Ivanoff. Dr. Ivanoff was the designated staff person to review requests for accommodations by students in the Graduate Social Work program.

60. On April 17, 2001, Dr. Ivanoff reviewed documentation of Mrs. G-Borwick's medical condition provided by her neurosurgeon and gave written notice to Plaintiff's professors requesting reasonable accommodations to complete course work to Plaintiff's professors. The Plaintiff's professors agreed and issued INC (incompletes) to allow her additional time to complete the coursework.

61. Plaintiff was not able to walk upstairs to access the graduate assistantship position, and ultimately lost compensation as a result of having to leave the graduate assistantship because of her medical condition. Instead, Plaintiff had to directly pay for her education by taking out student loans from. Additionally, Plaintiff's grades dipped slightly below a 3.5 grade point average, and it took longer for her to complete her assignments.

62. Because of the unavailability of another professor to chair Plaintiff's dissertation, Dr. William Cloud finally agreed to do so.

63. During the academic year beginning 2005/06, Plaintiff made an appointment with Dean James Herbert Williams to discuss her disability related delays, but Dean Williams insisted that the delays were the fault of Plaintiff. Dr. Cloud provided little or no helpful dissertation assistance in preparation and

completion of the dissertation, despite being informed about Plaintiff's medical problems and related disabilities. Instead Dr. Cloud accused Plaintiff of lacking motivation. The dissertation committee for the Plaintiff never met, which is contrary to promises made by the PhD Handbook and has been proven to assist students in the completion of their dissertations.

64. Plaintiff sought and was able to get two (2) limited academic extensions related to Plaintiff's known medical condition and disabilities. The first extension deadline was with the summer quarter of 2008 and the 2nd was for the summer quarter of 2009.

65. Plaintiff opted to pursue a 3rd extension, because the extension permitted uninterrupted studies, whereas a medical stop required an academic leave or temporary interruption of studies. Plaintiff desired to extend her studies, without the negative impact of academic interruption.

66. On August 9, 2009, Plaintiff was granted a 3rd extension and admonished, by Barbara Wilcots, Associate Provost, that this was Plaintiff's last extension. Wilcots told plaintiff "to finish the requirements of your degree and graduate by and of the summer quarter, June 2010 or your student status will be terminated."

67. Plaintiff submitted an informal complaint about certain insensitivities and advisory ineffectiveness of Dr. William Cloud. The complaint was submitted to Walter La Mendola, PhD, the doctoral program chair. Dr. William Cloud stepped down as dissertation chair.

68. Dr. Jim Moran accepted the role as Plaintiff's substitute doctoral dissertation adviser in November 2009. The transition from Dr. Cloud to Dr. Moran contributed to planning and completion delays in Plaintiff's doctoral dissertation schedule. She was expected to complete the dissertation between November 2009 and June 2010 or be terminated.

69. On August 17, 2009, Plaintiff sought to mitigate damages by filing a formal charge of discrimination against DU, with the Department of Education Office of Civil Rights, in case number 08092131. Plaintiff charged that she was discriminated against on the basis of disability when DU denied an extension to complete her PhD degree. That case is still under consideration.

70. Although plaintiff was making progress, she was not able to maintain her doctoral dissertation scheduling. Plaintiff filed a written petition requesting a another extension of time to complete her doctoral degree in the GSSW and DU.

71. The last extension was requested before the summer quarter of 2010, in order to further accommodates Plaintiff's physical and emotional disabilities, and because Plaintiff was required to attend to the family medical emergency of Plaintiff's natural mother, Lenola Lawrence.

72. On June 4, 2010, Dr. Walter La Mendola, Doctoral Program Director, together with Dr. James Herbert Williams and James Moran agreed to terminate Plaintiff from the GSSW doctoral dissertation program.

73. Plaintiff timely appealed the decision. On July 12, 2010, Plaintiff's right to appeal was approved by James Williams, PhD, in his capacity as GSSW Dean.

74. An ad hoc committee was appointed and met for the first time in July 2010, to consider the termination. On July 20, 2010 the ad hoc committee approved the termination, without providing an opportunity for Plaintiff to provide additional supportive documentation of her past record of accommodations.

75. On July 23, 2010, Dr. James Williams announced the decision of the Ad Hoc Committee. The ad hoc committee based their decision on the fact that the student was offered a medical stop in 2009, by the Graduate Division, while she was home recovering from a spinal surgery.

76. One August 12, 2010, Plaintiff appealed the decision of the ad hoc committee and Dr. James Williams to Provost Gregg Kvistad.

77. On September 20, 2010, Provost Gregg Kvistad denied the appeal. On January 18, 2011, Plaintiff filed an appeal with the Colorado Department of Higher Education. No response is been received as of the date of this pleading.

78. Because of the physical and psychological disabilities of Plaintiff, she was denied doctoral program studies access, loss of past income from graduate assistantships, timely selection of qualified doctoral chair assistance from dissertation advisors, future income and other accommodations provided to other doctoral students. She requested reasonable accommodations requested by letters alerting professors, as well as written requests for extensions. She was denied

standard doctoral chair program advice. She was denied standard advice regarding reasonable accommodation application procedures.

79. DU, GSSW, the Provost, Vice Provost, Associate Provost, Dean, Chair of the Doctoral Program, GSSW Advisors and the ad hoc committee have acted to exclude or otherwise deny Plaintiff of equal program access, due process, privileges, and reasonable accommodations and other opportunities to complete her doctoral dissertation. Similarly situated students in the PHD program were given program access, due process, privileges, reasonable accommodations and opportunities to complete their dissertation.

80. That by reason of the aforesaid, the Plaintiff has been damaged by the actions of the University of Denver, GSSW, the Provost, Vice Provost, Dean of the GSSW and the ad hoc committee which we intend to prove at trial.

**SECOND CAUSE OF ACTION—BREACH OF CONTRACT AND BREACH OF IMPLIED CONTRACT (i.e. Promissory Estoppel)**

81. Plaintiff hereby incorporates paragraphs 1 through 81 as though fully set forth herein.

82. In 2001, Plaintiff and DU entered into an agreement to provide a postgraduate educational curriculum and degree, in exchange for the payment of tuition. Plaintiff applied and was accepted to the DU -GSSW PhD program.

83. As part of the Agreement, Defendant agreed to provide a personalized graduate education, customized to her academic student interests and needs, including but not limited to mentoring and personal attention, as well as faculty committed to teaching and easily accessible to students. The doctoral program at the Graduate School of Social Work promised to train Plaintiff to become a social

work researchers, educator and policy expert, and at the end of the offered curriculum, present Plaintiff with a doctorate degree.

84. Defendants intentionally and materially breached its agreement with Plaintiff by failing to provide reasonable accommodations based upon Plaintiff's disability and her association with a physically disabled family member. They failed to provide work study opportunities, solely because of Plaintiff's disabilities and due to architectural barriers that could have otherwise been accommodated without causing financial hardship to Defendants.

85. As a result of the breach(es) of the agreement by Defendants, Plaintiff has incurred damages and will continue to incur damages to be proven in court.

86. Plaintiff fully performed her academic obligation which was to continue her gradual progress towards the completion of her doctoral dissertation.

87. Denver University has an antidiscrimination policy that is approved by the Chancellor, and recommended by the Provost and Vice Chancellor. According to the policy goals of DU, as a state, national and international institution of higher education.

88. The University of Denver promised to maintain a community in which people are treated with dignity, decency, mutual trust, freedom of inquiry and expression, and the absence of intimidation, oppression and exploitation.

89. Plaintiff, relied to her detriment, upon the university's commitment that it will not tolerate unlawful discrimination or harassment of any kind, and that the University would seek to prevent, correct and discipline behaviour that violates this promise.

90. The University violated its own diversity and anti-discrimination policies by denying this disabled doctoral candidate the financial benefits of educational or graduate assistantship employment opportunities and privileges afforded other doctoral candidates.

91. The failure to properly and consistently toll academic programs deadlines based on plaintiff's known physical and educational disabilities was arbitrary, capricious and in breach of the contract agreement between the student and the institution.

92. DU and GSSW failed to comply with the prohibitions of these anti-discrimination laws.

93. That by reason of the aforesaid, the Plaintiff has been damaged in the sum to be proven at trial.

**THIRD CAUSE OF ACTION-CIVIL RIGHTS ACTION**
**Intentional Discrimination Based on Disability**
42 U.S.C. §12112 (b)(5)(B), and 29 U.S.C. §§701 and 794 et seq.

94. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs marked 1 through 94 with the same force and effect as if more fully and at length set forth herein.

95. Plaintiff is a qualified individual with a disability as defined by section 101 (8) of the Americans with Disabilities Act, 42 U.S.C. §12111 (8).

96. Plaintiff was fully and academically qualified to meet the academic requirements for writing for her doctoral dissertation.

97. Plaintiff was making progress towards completion of her dissertation.

98. Defendants' continued refusal to allow Plaintiff to complete her dissertation constitutes discrimination against Plaintiff based on her disability.

99. Defendants discriminated against Plaintiff by refusing to allow reasonable accommodations, including extensions and medical stop's necessary to complete the GSSW PhD program.

100. Defendants' actions constitute intentional , wilful, wantonnd unlawful acts of discrimination in violation of the Americans with disabilities act of 1990, 42 U.S.C. §12112 (b) (5) (B) and section 504 of the rehabilitation act of 1973, as amended, 29 U.S.C. §§70 and 794 et.seq.

101. Discrimination is strictly prohibited by federal, state and local laws, including Title VII of the Civil Rights Act of 1964; the Age Discrimination in Employment Act; Title IX of the Education Amendments of 1972; the Age Discrimination Act of 1975; section 504 of the Rehabilitation Act; the Americans with Disabilities Act of 1990; Title 24, Article 34 of the Colorado Revised Statute, and Denver Municipal Ordinance.

102. That by reason of the aforesaid, the Plaintiff has been damaged in the sum to be proven at trial.

**THIRD CAUSE OF ACTION-CIVIL RIGHTS ACTION**
**Disparate Impact**
42 U.S.C. §12112 (b)(5)(B) and 29 U.S.C. §§701 and 794 et seq.

103. Plaintiff incorporates paragraphs 1 through 103 inclusive, as a fully set forth herein.

104. The pre-academic separation procedures normally afforded other undergraduate and graduate school students was not provided to plaintiff as a procedural condition precedent to separation. In this fashion, Defendants discriminated against Plaintiff when it maintained policies that resulted in disparate impact on the Plaintiff.

105. As a result of the illegal actions and conduct on the part of Defendants, their agents, servants and employees, Plaintiff was wrongfully terminated from the doctoral program and thereby denied and delayed in the opportunity to provide community-based social services and earn an income for professional services to be rendered, without a full and fair pre-termination hearing or opportunity to participate in such a hearing.

106. Defendant's actions constitute an intentional and unlawful employment practice and policy in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12112 and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§701, 794 et seq.

107. That by reason of the aforesaid, Plaintiff has been damaged in the sum to be proven at trial.

**FOURTH CAUSE OF ACTION-CIVIL RIGHTS ACTION UNDER 42 U.S.C. § 1983**

42 U.S.C. §2000a and 42 U.S.C. §1983, Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 (as amended)

109. Plaintiff incorporates paragraphs 1 through 108 inclusive, as a fully set forth herein.

110. Defendants, as an institution that receives federal funding of some of their social service projects and programs, violated and abridged Plaintiff's civil

rights under 42 U.S.C. § 1983 in that Plaintiff was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States of America .

111. By and through individuals enabled by the Board of Trustees and the Chancellor, defendants acted under color of a statutes or regulations of the State of Colorado, deprived plaintiff of her education, educational due process rights and contract privileges and immunities secured by the 14th amendment of the Constitution of the United States and the antidiscrimination statutes of the United States and the State of Colorado.

112. Defendant's termination of Plaintiff from the doctoral program violated the 14th amendment to the United States Constitution in that plaintiff was punished, pursuant to an institutional rule which is invalid on its face and as applied, punished plaintiff without reference to promulgated rules and regulations, denied plaintiff a full and proper hearing prior to the termination. Plaintiff should have been entitled to a proper hearing with notice to prepare prior to the hearing. Plaintiff should have been afforded a fair and impartial decision after a full, fair and impartial hearing.

113. The termination of plaintiff amounted to arbitrary punishment without a reasonable basis, and thereby denied plaintiff the benefits and privileges of the contract that she entered into to receive a full proper education from the defendant institution. Such punishment is arbitrary and improper in violation of the 14th amendment to the United States Constitution.

114. The termination of plaintiff interfered with her education by preventing her from keeping pace with the instruction given to other doctoral candidates.

115. Defendants are engaged in a widespread pattern of arbitrary termination of disabled students, without published rules and an opportunity to prepare for a hearing in which the burden of proof is on defendants to show a material departure from gradual academic progress.

116. That by reason of the aforesaid, Plaintiff has been damaged in the sum to be proven at trial.

**FIFTH CAUSE OF ACTION-CIVIL RIGHTS ACTION**
**Reprisal**
29 U.S.C. §§701, 749 et seq.

117. Plaintiff incorporates paragraphs 1 through 116 inclusive, as though fully set forth herein.

118. The Plaintiff is a qualified individual with a disability.

119. Plaintiff was fully qualified form as a doctoral student.

120. Defendants intentionally retaliated against Plaintiff and engaged in unlawful employment practices and policies in violation of 42 U.S.C. §12203 and 29 U.S.C. §§701 et seq., including discrimination based upon disability, when Plaintiff requested reasonable accommodations, complaint of discrimination or otherwise opposed practices may unlawful by 42 U.S.C. §12112 and 29 U.S.C. §§701 et seq.

121. That by reason of the aforesaid, Plaintiff has been damaged in the sum to be proven at trial.

**WHEREFORE**, Plaintiff requests that this court enter judgment in Plaintiff's favor and that the court enter declaratory judgment enjoining Defendants from punishing or depriving Plaintiff and similar disabled students in need of reasonable academic extensions and accommodations, pursuant to 42 U.S.C. §12117, 29 U.S.C. §§794 et seq. and 42 U.S.C. §2000 a, as Defendants have violated the rights secured by Plaintiff by U.S.C. §12112 (ADA) and 29 U.S.C. §§701 et seq. (rehabilitation act), to be free of discrimination, and that the court Order the Defendants to make Plaintiff whole by reinstating Plaintiff into the GSSW doctoral program, and award to Plaintiff:

A. Compensatory and punitive damages pursuant to 42 U.S.C. §12117, 29 U.S.C. §§794a et seq., 42 U.S.C. §2000a and 42 U.S.C. §1983, for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, in an amount to be shown at trial.

B. Costs of this action;

C. Reasonable attorney fees;

D. Expert witness fees;

E. Pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

F. Such other and further relief as this court may deem appropriate.

**Plaintiff demands a TRIAL BY JURY as to all claims.**

**<u>Plaintiffs' Address:</u>**

Carolyn Jean Gissendanner Borwick
2217 Jasmine Street
Denver, Co  80207

Respectfully submitted, June 10, 2011.

By: The Sadler Law Office

s/Derry Dale Sadler
Derry Dale Sadler
84oo E. Prentice Avenue, Ste. 1500
Greenwood Village, CO 80111
Office: (303) 409-7602
Fax: (303) 955-2336
derrydaled@comcast.net