IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-01216-MSK-KMT

CAROLYN JEAN GISSENDANNER BORWICK,

      Plaintiff,

v.

UNIVERSITY OF DENVER, BOARD OF TRUSTEES;
UNIVERSITY OF DENVER GRADUATE SCHOOL OF SOCIAL WORK;
ROBERT COOMBE, Chancellor, in his official capacity;
GREG KVISTAD, individually and as Denver University Provost;
DR. JAMES R. MORAN, PhD, individually and as Professor and Director of the Doctoral
Program of the Graduate School of Social Work;
DEAN JAMES HERBERT WILLIAMS, individually and as Dean of the Graduate School
of Social Work; and
DR. WILLIAM CLOUD, individually and as Professor of the Graduate School of Social
Work,

      Defendants.

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

_____

      **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment (**# 58**), Ms. Borwick's response (**# 62**), and the Defendants' reply (**# 72**);

and the Defendants' Motion to Strike (**# 70**) Ms. Borwick's affidavit in support of her summary

judgment response, Ms. Borwick's response (**# 73**), and the Defendants' rely (**# 74**).[1]

_____

[1]      The Court denies the Defendants' Motion to Strike. The Defendants itemize seven
alleged instances in which Ms. Borwick's statements in her affidavit are inconsistent with her
deposition testimony. The Court finds that the itemized statements are not inconsistent with the
listed deposition testimony. To the extent the Court ascertains a genuine inconsistency between
Ms. Borwick's affidavit and her prior testimony on a point that is material to the analysis herein,
the Court will identify it as such and address it.

# FACTS[2]

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis, construing all evidence in the light most favorable to the non-movant.

In 2000, Ms. Borwick enrolled in a Ph.D. program in the University of Denver's ("DU") Graduate School of Social Work (the "School").  The School provides students with seven years to complete the program, with the first two years typically devoted to class instruction and the final five years devoted to the student preparing and submitting a dissertation.  School policies expressly provide that a student who fails to complete the program within seven years will be terminated from it.

In 2001, Ms. Borwick was involved in an automobile accident in which she suffered serious injuries.  The need for extensive medical treatment and ongoing rehabilitation for those injuries caused Ms. Borwick to fall behind in her progress through the class instruction phase of the program, and in 2001, she requested that the School authorize additional time for her to

---

[2]      The Court has had some difficulty in assembling a factual recitation in this matter because Ms. Borwick's lengthy, somewhat unfocused, and often redundant summary judgment response contains extensive factual assertions without any supporting citations to evidence. *See e.g.* Docket # 62 at 13-17.  In addition, Ms. Borwick submitted nearly 400 pages of evidentiary material, often addressing matters that are not genuinely in dispute, or even particularly relevant. *See e.g.* Docket # 70, Ex. 1 (acceptance letter to program), Ex. 4 (traffic report from auto accident), Ex. 5 (2002 dissertation committee form approving Ms. Borwick's proposal), Ex. 9 (Ms. Borwick's 1999 application to the program), Ex. 10 (DU articles of incorporation), etc.

Given the length of Ms. Borwick's response and the volume of evidentiary material she has submitted, the Court has elected to constrain its examination of the facts to only those matters for which Ms. Borwick's brief has supplied a specific citation to supporting evidence. The Court will not independently canvass the record to locate evidentiary material that supports allegations by Ms. Borwick for which no supporting citation is provided.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (district court has discretion to go beyond the cited potions of the evidentiary record, but is not required to do so, and indeed, should be "wary of becoming advocates who comb the record of previously available evidence and make a party's case for it.")

complete the class instruction phase.  The School granted that request, and Ms. Borwick

completed the class instruction phase of the program in 2004.

Ms. Borwick then began the dissertation phase of the program.  She selected Dr. William

Cloud as her dissertation advisor, and Dr. Cloud created a dissertation committee consisting of

himself, Dr. William King, and Dr. Enid Cox.  Ms. Borwick alleges that she did not receive

sufficient support from Dr. Cloud or the members of the dissertation committee, but except as

discussed specifically below, it is not necessary to address those contentions in detail.

In May 2007, with the seven-year deadline looming, Ms. Borwick formally requested that

she be granted a one-year extension of time to complete the program.  She explained that:

> [d]uring the past seven years, I have had serious medical problems
> that interfered with my timeline for completion of the degree.
> After taking time to deal with the medical issues, I feel more
> confident that I am now able to do the type of work that is
> required. . . . I believe that I will need at least one year to complete
> the project that I proposed.

The School granted Ms. Borwick's request, giving her until "the end of Summer Quarter 2008"

to complete her degree.

In July 2008, Ms. Borwick made a second request to extend the deadline to complete the

program. She explained that she "experienced depression along with the physical problems

relating to" the 2001 accident, and cited an onset of depression she experienced as a side-effect

of medication she was taking as an obstacle to her completing the dissertation.   On August 21,

2008, the School approved Ms. Borwick's request and granted an extension to the end of

Summer Quarter 2009 to finish her degree.

On April 29, 2009, Ms. Borwick informally applied for a third extension of the deadline

to complete the program.  That request cited to "a number of major surgeries" (including one on

April 21, 2009) related to the auto accident, as well as "a strenuous rehabilitation program that follows." In response, a School official wrote to Ms. Borwick and explained that "if you don't know how long it will take to recover and you won't be in any condition to be doing academic work then it would to your advantage to apply for a medical stop out instead of an extension of time." The letter explained that for an extension of time to apply, a faculty member must certify that she was making progress on her dissertation; on the other hand, if her doctor were to certify that medical issues precluded her from performing academic work, she would be eligible for a suspension of the deadline until such time she had recovered. Although Ms. Borwick acknowledges that she was aware of the medical stop option, on June 22, 2009, she requested an extension of time to complete her degree instead.

At some point, Ms. Borwick became dissatisfied with Dr. Cloud as her dissertation advisor. As early as April 2009, she was writing to School officials, exploring the possibility of seeking another advisor. In an April 2009 e-mail, she states that "I like [Dr. Cloud] a lot [and] I am sure that I can do it with [him], but I would prefer to work with someone else who is interested in me as a student and in my work." On July 24, 2009, Ms. Borwick and Dr. Cloud jointly requested that Dr. Cloud be relieved as her dissertation advisor. Dr. Moran was appointed Ms. Borwick's new dissertation advisor in December 2009.

On August 6, 2009, the School approved Ms. Borwick's third request for an extension of the deadline to complete her dissertation. However, the letter approving that extension expressed "concerns that must be considered . . . in relation to progress towards your degree," specifically the fact that she had been expected to make satisfactory progress towards completion of her

degree as a condition of the prior two extensions, and the fact that she had elected not to pursue a medical leave of absence.  The letter concluded as follows:

> While I understand that you have been dealing with an ongoing health condition, a third extension is a seriously (sic) prolonging of the time for completion of a degree.  After reviewing the documentation and input from the [School] faculty that they are willing to support one additional extension for you to complete your degree, *I am granting you permission for the third extension but no further extensions will be allowed.*
>
> This is your opportunity to make up the work you should have completed during your first and second extensions and finish your degree.  You are advised to meet all the requirements for your degree and strictly adhere to the deadlines set by your advisor and the committee or face termination from your program.
>
> Please make good use of this last extension and work quickly to *finish the requirements for your degree and graduate by the end of the Spring quarter, June 2010* or your student status will be terminated.  (Emphasis in original.)

On August 18, 2009, Ms. Borwick filed a complaint of discrimination concerning Dr. Cloud with the United States Department of Education's Office of Civil Rights.  The parties have not submitted a copy of the complaint, nor described it (or the circumstances surrounding it) in any significant detail.  Ms. Borwick's affidavit states that the complaint concerned "a stray remark concerning age and race" made by Dr. Cloud "based upon my attempts to discuss my need for reasonable accommodation."  The record does not reflect what became of this complaint, whether it was served on Dr. Cloud or the School, any response that Dr. Cloud or the School may have been made to it, or any circumstances beyond the mere fact that Ms. Borwick made such a complaint.[3]

---

[3]     In the interests of full disclosure, the Court notes that Exhibit 27 to Ms. Borwick's response brief is a copy of a complaint that does not conform to Mr. Borwick's description in her

Despite the admonishment that came with the third extension, Ms. Borwick fell behind in her efforts to complete her dissertation.  Correspondence between her and Dr. Moran indicate that in January and February 2010, Dr. Moran was concerned about Ms. Borwick's lack of progress and her failure to file a formal notice of her intent to graduate in the Spring.  (Indeed, in a January 8, 2010 message, Dr. Moran advised her that "[w]hile I am willing to request another extension if you are close to finishing, there is no guarantee that it will be granted.  You have to operate on the assumption that you need to finish this year.")  Ms. Borwick responded to the messages with assurances that she remained on schedule.  However, by April 2010, she was beginning to recognize the need for an additional extension of time in order to complete her project.

On April 13, 2010, Ms. Borwick advised Dr. Moran that her adoptive mother had become ill and required hospitalization.  She informed him that she intended to travel to Oklahoma to care to tend to her adoptive mother, but that she would continue working on her dissertation and "was determined to make it work," apparently referring to completion prior to the end of the Spring quarter.  However, Ms. Borwick was also contemplating seeking an extension through August 2010, a suggestion initially made to her by Dr. Moran.  In late May 2010, Dr. Moran

---

response.  It mentions nothing about a remark by Dr. Cloud but instead complains about the fact that the School advised her that it would not award her further extensions of the deadline to complete her degree.  The Court has carefully examined Ms. Borwick's brief to ascertain whether it refers to Exhibit 27, and observes that the only citation to that exhibit is in support of the assertion that "When Chancellor Coombe failed to respond [to an appeal filed by Ms. Borwick in November 2010, Plaintiff filed an appeal with the Colorado Department of Higher Education on January 18, 2011."  *Docket #* 62 at 20.

Needless to say, a complaint filed with the U.S. Department of Education in 2009 is entirely different from a complaint allegedly filed with the State of Colorado in 2011.  The fact that Ms. Borwick filed a complaint with state authorities in 2011 is not pertinent to the matters herein.

again wrote to Ms. Borwick, advising her that her extension of time expired at the end of June

and inquired of her progress.  He again indicated to Ms. Borwick that, if she had been making

substantial progress, he would support her in requesting an additional extension.

On June 1, 2010, Dr. Moran wrote to Ms. Borwick asking for a report on her current

status.  He advised her that the extension she had been granted "is now at an end," and that she

was likely to be terminated from the program at the end of June.  He explained that, to obtain a

further extension (although he acknowledged that it was "doubtful that a further extension will

be granted"), she would have to apply immediately, and would have to demonstrate "strong

support from your committee."  He asked "How can we support you in a request for an extension

when you have missed both your own deadlines and almost every deadline we have agreed on,

made relatively little progress on the chapters, and failed to meet my requests for you to work

closely with [one of the committee members] on the analysis?"  He asked her to submit "a

realistic plan for completing your dissertation," and an assurance that she would follow the

committee's directions and meet future deadlines without further delays.  He also instructed her

to "apply to the Graduate School for an extension of time.  Do this NOW."   She responded, in

part, that "I will contact the graduate office.  I will do whatever they suggest.  I thought that the

time had expired and that I would have to seek other options to remain in the program.  I

understood that with your recommendation the time might be extended."  On June 3, 2010, Dr.

Moran again urged Ms. Borwick to seek an extension of the deadline, and she acknowledged

that, as of that date, she had not done so.  (She testified in her deposition that she had amended

her application to graduate to list August 2010 as her graduation date, and that request had been

approved, leading to some confusion.)

On June 4, 2010, the School formally informed Ms. Borwick that "due to [her] failure to meet the conditions of the 9 August 2009 letter . . . you have been terminated from the PhD program."

On June 21, 2010, Ms. Borwick wrote to the School, formally requesting an additional extension of time to December 2010 complete her degree.  She also appealed the decision to terminate her student status.  The record does not reflect any formal ruling on the request for an extension (although the parties appear to agree that it was denied). The School reviewed Ms. Borwick's appeal of her termination, and on July 20, 2010, affirmed its decision to terminate her. The Committee hearing the appeal found among other things: (i) that she was "given numerous opportunities by the University to complete her dissertation"; (ii) that she was aware of the deadlines given to her and that she would be terminated if she did not meet the requirements set forth in the third extension"; (iii) that she failed to meet deadlines imposed upon her by her committee, the University, and herself; and (iv) that it could "find no mitigating factors in their review that . . . were sufficient enough to suggest that her termination should be reconsidered." Ms. Borwick availed herself of certain other avenues of appeal, but was unsuccessful in vacating her termination.

Ms. Borwick then commenced the instant action.  In her Second Amended Complaint (**#29**), she asserts five claims: (i) discrimination on the basis of disability in public accommodations, in violation of Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; (ii) a claim asserting both "breach of contract and breach of implied contract (*i.e.* promissory estoppel), insofar as DU "agreed to provide a personalized graduate education . . . as well as faculty committed to teaching and easily accessible to students," but

breached that agreement "by failing to provide reasonable accommodations based upon [her] disability and her association with a physically disabled family member, fail[ing] to provide work study opportunities, and . . . due to architectural barriers that could otherwise have been accommodated"; (iii) a claim for "intentional discrimination based on disability" under both the ADA, and under the Rehabilitation Act, 29 U.S.C. § 701, 794[4]; (iii) a disparate impact claim, invoking both Title I of the ADA and the Rehabilitation Act, alleging that "the pre-academic separation procedures normally afforded other undergraduate and graduate school students were not provided to plaintiff as a procedural condition precedent to separation," such that "Defendants discriminated against Plaintiff when it maintained policies that resulted in disparate impact on Plaintiff"; (iv) a claim under 42 U.S.C. § 1983 (also referencing Title II of the Civil Rights Act of 1964, the ADA, and the Rehabilitation Act in a subheading), alleging that the Defendants "deprived plaintiff of her education, educational due process rights, and contract privileges and immunities secured by the 14th Amendment," "punished [her] pursuant to an institutional rule which is invalid on its face and as applied," deprived her of a fair and impartial hearing, administered "arbitrary punishment without a reasonable basis and thereby deprived [her] the privileges and immunities of the contract that she entered into," "interfered with her education by preventing her from keeping pace with the instruction given to other doctoral candidates," and "engaged in a widespread patter of arbitrary termination of disabled students . . ."; (v) a retaliation claim under the Rehabilitation Act (the body of the claim also references the

---

[4]     This cause of action references a host of additional statutes, including Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and provisions under C.R.S. § 24-34-101 *et seq.*, and unspecified "Denver Municipal Ordinance."  However, because the claim does not specify any specific provisions of these statutes that were allegedly violated, the Court treats this claim as arising solely under the specified provisions of the ADA and Rehabilitation Act.

ADA) in that she was retaliated against for "request[ing] reasonable accommodations [or making a] complaint of discrimination."

The Defendants move **(# 58)** for summary judgment on all claims.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  See Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Reasonable accommodation

Ms. Borwick's first claim, sounding in disability discrimination in violation of Title III of the ADA, invokes 42 U.S.C. § 12181.  That statute prohibits discrimination on the basis of disability in any "place of public accommodation."  42 U.S.C. § 12182(a).  It is undisputed that universities and graduate schools are "places of public accommodation."  42 U.S.C. § 12181(7)(j).  The Court understands this claim to allege that the Defendants violated the ADA by failing to make a reasonable accommodation.  (This claim differs from a claim of intentional discrimination, as discussed below, insofar as there is not required showing of an intent to discriminate in a failure to accommodate claim.  *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1001 (9th Cir. 2008)).

To establish a claim under this statutory provision, Ms. Borwick must show: (i) that she is disabled, within the meaning of the ADA, but "otherwise qualified academically" for the relief that she seeks; (ii) that the School is a place of public accommodation; (iii) that she was denied the full and equal enjoyment of the services and facilities of the School; and (iv) that the School failed to make reasonable modifications which would accommodate her disability without fundamentally altering the nature of its services.[5] *Dahlberg v. Avis Rent A Car System, Inc.*, 92 F.Supp.2d 1091, 1100 (D. Colo. 2000); *see also Doe v. Oklahoma City Univ.*, 406 Fed.Appx. 248, 250-51 (10th Cir. 2010) (unpublished).

The Defendants begin by challenging Ms. Borwick's ability to meet the first element: assuming she is disabled under the statute, they argue that she is not "otherwise qualified

---

[5]     The Court pauses to acknowledge that, based on its reading of Ms. Borwick's response brief, it does not appear that Ms. Borwick is asserting that she was discriminated against by the Defendants because of her own disability.  Rather, the Court understands her to assert that she missed the deadline for completing her dissertation by June 2010 solely because of her adoptive mother's illness (and her need to assist her mother).  Ms. Borwick invokes 42 U.S.C. § 12182(b)(E), which prohibits discrimination based on "the known disability of an individual with whom [the plaintiff] is known to have an relationship or association."  In other words, Ms. Borwick alleges that the Defendants discriminated against her because she chose to associate with her disabled adoptive mother.

Although the Court finds that Ms. Borwick lacked the academic qualifications to obtain any relief, on the apparent associational Title III claim, summary judgment in favor of the Defendants is appropriate because Ms. Borwick has presented no admissible evidence establishing that her adoptive mother has/had a disability.  Ms. Borwick's response brief repeatedly refers to her adoptive mother as "disabled," but the only evidentiary material that Ms. Borwick's response actually cites to regarding her adoptive mother's condition is a passage at page 72 of Ms. Borwick's own deposition in which she states that her adoptive mother "had an impacted bowel surgery" from which she recovered.

Ms. Borwick dwells more extensively (albeit without significantly more supporting evidence) on the disabilities plaguing her natural mother, but it is evident from the record that Ms. Borwick's acts in addressing the medical needs of her natural mother did not begin until mid-June 2010, after she had already been terminated from the program.  Thus, her association with her natural mother could not have prompted the Defendants' decision to terminate her student status.

academically."  An individual is "otherwise qualified academically" if she can "meet all of a program's requirements, in spite of a disability, with or without reasonable accommodation." *Millington v. Temple Univ. School of Dentistry*, 261 Fed.Appx. 363, 366 (3d Cir. 2008) (unpublished), *citing McDonald v. Pennsylvania*, 62 F.3d 92, 96 (3d Cir. 1995).  Courts have been emphatic that, when attempting to assess the substance of a decision regarding academic qualifications, "they should show great respect for the faculty's professional judgment. *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 213, 225 (1985); *Klene v. Trustees of Indiana Univ.*, 413 Fed.Appx. 919, 921 (7th Cir. 2011); *Mershon v. St. Louis Univ.,* 442 F.3d 1069, 1078 (8th Cir. 2006).  In such circumstances, a student's own lay opinion as to her own satisfactory qualifications is not sufficient to create a triable claim. *Klene*, 413 Fed.Appx. at 921.

Ms. Borwick does not appear to dispute that the School had a requirement that a student complete a degree in seven years, nor does she dispute that the School required that individuals seeking to obtain an extension of that deadline demonstrate that they were nevertheless making satisfactory progress towards completing their degree.  It is not entirely clear to the Court what "reasonable accommodation" Ms. Borwick alleges that the Defendants denied to her, as it is undisputed that she made no request for a fourth extension before the School's June 4, 2010 decision to terminate her.  (As noted above, her request for a fourth extension was not made until June 21, 2010.)

If Ms. Borwick's position is that a reasonable accommodation of her disability would have been the grant of a fourth extension of the deadline for completion of her dissertation, she would have to show that she had qualified for such an extension by making satisfactory progress on that dissertation to justify the extension.  Giving due deference to the School's professional

13

judgment on such matters, it is undisputed that she was not making such progress. Dr. Moran's June 1, 2010 message to her explained that "you have missed both your own deadlines and almost every deadline we have agreed on, made relatively little progress on the chapters, and failed to" comply with instructions that had been given to her. The same conclusion was reached by the Committee that examined her appeal of her termination.

By contrast, Ms. Borwick has not come forward with any evidence that school officials found her progress to be satisfactory. Essentially, she offers only her own belief in that regard. Although Ms. Borwick argues that Dr. Wilcots, the Associate Provost of the School and the person responsible for deciding whether additional extensions would be granted, "admitted that Plaintiff was qualified to do the work academically", her construction is a misstatement of Dr. Wilcots' deposition testimony. Asked whether she would admit that Ms. Borwick "was qualified to do the work academically," Dr. Wilcots responded that "That would not be my call. That would be the assessment of her academic advisors." Dr. Wilcots also testified that she disagreed with Ms. Borwick's counsel's suggestion that "[Ms. Borwick's] dean was satisfied and her advisory chair was satisfied" with her academic progress, stating that "I don't know about the dean [but] I did get input from her advisor who was not satisfied."

Ms. Borwick also relies on the deposition testimony of Dr. Moran. During that deposition, Dr. Moran was questioned about a document (which is not in the record before this Court), that he apparently submitted to the School on Ms. Borwick's behalf on June 25, 2010. Asked to read the document, Dr. Moran read the following excerpt aloud: "As an aside, but an important one, [Ms. Borwick] has made a great deal of progress since we started working with her in mid-November last year. Her committee believes that if she is allowed to go forward, she

14

can complete her work by December and graduate at the end of the winter quarter." Dr. Moran

indicated that he made that assertion acting in his role as Ms. Borwick's dissertation advisor,

which he viewed as requiring him to "advocate" for her. Asked whether that statement was

inconsistent with Dr. Moran's deposition testimony that he personally was not satisfied with Ms.

Borwick's progress, Dr. Moran explained that "She'd not made as much progress as she should

have, and that I wasn't satisfied with it, but I thought we could move forward." The Court finds

that this testimony does not create a genuine dispute of fact as to whether the School believed

that Ms. Borwick was making satisfactory academic progress towards her degree.

As a result, Ms. Borwick has not come forward with evidence sufficient to demonstrate

that she was "otherwise qualified academically," and thus, the Defendants are entitled to

summary judgment on her Title III claim.

Assuming, however, that Ms. Borwick could demonstrate that she had adequate

qualifications, entry of summary judgment  in favor of  the Defendants nevertheless would be

appropriate. Ms. Borwick is required to show that the Defendants denied her "reasonable

modifications which would accommodate her disability." The only apparent "accommodation"

that Ms. Borwick appears to contend she required was an extension of time beyond June 2010 to

complete her dissertation. However, the record makes clear that her inability to meet the June

2010 deadline was not the result of her disability – as had been the reasons for her seeking the

first two extensions of the seven-year deadline – but rather, time-consuming circumstances

relating to her adoptive mother's own health condition. Ms. Borwick was asked at her

deposition if "the only impediment to you successfully completing your dissertation within the

time frame of the third extension of time was the issues and medical issues surrounding your

15

[adoptive mother]," and Ms. Borwick responded "that's correct."  Thus, it is clear that Ms.

Borwick's own disability played no role in her failure to complete her dissertation within the

third extension period, and thus, there were no consequences from that disability for the School

to accommodate at that point in time.[6]

Accordingly, the Defendants are entitled to summary judgment on Ms. Borwick's claim

arising under Title III of the ADA.

### C. Contract claims

The Court turns to Ms. Borwick's claims sounding in breach of contract.  To prove a

claim of breach of contract, Ms. Borwick must show: (i) the existence of an enforceable contract;

(ii) her performance as required by that contract, or that such performance was excused; (iii) the

Defendants' non-performance under the contract; and (iv) resulting damages.  *Western*

*Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Ms. Borwick identifies the DU Office of Graduate Studies Graduate Policy Manual as

setting forth the terms of the contractual agreement between herself and the Defendants.  It is

somewhat difficult to extract from her brief a cogent listing of the specific statements in that

manual that she contends constitute contractual terms that the Defendants allegedly breached.

She quotes a "basic principle" that "require[s] all [dissertation] committee members to be

---

[6]     As noted above, Ms. Borwick appears to be fashioning her Title III claim as one arising
out of her association with a disabled person, namely, her adoptive mother.  Courts have
regularly found that although the ADA prohibits discriminating against a person based on their
association with a disabled individual, it does not require that an employer (or, arguably, a place
of public accommodations) provide a reasonable accommodation to the person as a result of that
association.  *See Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337 (7th Cir.
2012); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009) ("the association
provision does not obligate employers to accommodate the schedule of an employee with a
disabled relative").

involved in decisions and checkpoints in a very active manner[;] further, . . . the Ph.D. Program

Director serves as a quality checkpoint/monitoring role by reviewing and signing off on

decisions at various points in the process."[7]  She mentions (but does not quote) a statement to the

effect that "the key role of the factual advisors is to assist PhD students in completing their

educational plan" and a provision that "committee members shall be involved in the review and

approval of the final design statement, data collections instruments, sampling plan, the final draft

of the study, and other issues."  She asserts, but does not provide the supporting evidence of, a

"promise[ ] that the Ph.D. Program Director will advise all beginning students for the first year

and by the end of the first year students will be permitted to consult with the Director regarding

the appointment of a permanent advisor."  She also cites the Court to provisions regarding the

composition of the dissertation committee, and various other items in a lengthy discussion of the

contract claim.

The Court need not explore the matter in great depth, as it is obvious that the "promises"

Ms. Borwick cites are not contractually enforceable.  A fundamental requirement for

enforcement of a contract is that the terms "must be sufficiently definite to enable to court to

determine whether the contract has been performed or not."  *Stice v. Peterson*, 355 P.2d 948, 952

(Colo. 1960).  It is not clear that there is language in the manual that is phrased in such

mandatory terms that it could create a contractual obligation, but more importantly, the general

language upon which Ms. Borwick relies is not specific enough to be enforced.  For example,

---

[7]       The Court obtains this language from Ms. Borwick's brief.  Although she cites to pages
of the manual in support of this contention (at page 60 of her response brief), she does not supply
a corresponding exhibit number where these pages can be found.  The Court has reviewed Ms.
Borwick's various exhibits, and although she supplies excerpts from the manual as various
exhibits, *e.g. Docket* # 65, Ex. 2, Ex. 21, Ex. 45, the Court has not located any exhibit containing
the pages referenced here.

the alleged promise that dissertation committee members would be involved in unspecified "decisions and checkpoints" in a "very active manner" is an aspirational statement or general policy. It would be impossible for the Court or a jury to ascertain how to measure or evaluate what conduct constitutes a "very active manner".  Statements that a dissertation advisor plays a "key role" or "assist[s]" a student is similarly vague.

In addition,  the Court agrees with the Defendants that, even if Ms. Borwick's contractual claims were cognizable, many would be barred by the statute of limitations.  Under Colorado law, breach of contract claims must be brought within three years of accrual.  C.R.S. § 13-80-101(1)(a).  Ms. Borwick commenced this action on May 6, 2011.  From a timing perspective, only claims for breach of contract for events occurring later than May 6, 2008 would be permissible.  Thus, a claim with regard to breaches relating to guidance that she was supposed to receive as a first-year student in 2001, or promises relating to the composition or initial activities of a dissertation committee that was formed (with her consent, the Court notes) sometime in or about 2004, are untimely.

Accordingly, the Court finds that Ms. Borwick has failed to allege facts demonstrating the existence of any sufficiently definite contractual promise made by the Defendants that would support a breach of contract claim, and thus, the Defendants are entitled to summary judgment on that claim.  For the same reasons, the Court further finds that Ms. Borwick cannot recover in promissory estoppel either, as the requirement that promises be of sufficient definiteness to permit enforcement applies to that claim as well. *G&A Land, LLC v. City of Brighton*, 233 P.3d 701, 704 (Colo. App. 2010).

### D.  Disability discrimination

Ms. Borwick's third claim for relief sounds in intentional disability discrimination under both the ADA and the Rehabilitation Act.  The analysis under both statutes is identical.  *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002).  The Court applies the familiar *McDonnell-Douglas* burden-shifting framework, in which Ms. Borwick is required to first establish a *prima facie* case that: (i) she is disabled; (ii) she was "otherwise qualified" for the relief she seeks; and (iii) there are circumstances giving rise to an inference that the Defendants were motivated by her disability in taking the action against her. *Shepherd v. U.S. Olympic Committee*, 464 F.Supp.2d 1072, 1089-90 (D. Colo. 2006); *see also Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999).  If Ms. Borwick carries this burden, the Defendants must articulate a reasonable, non-discriminatory reason for their actions, and Ms. Borwick must ultimately show that the proffered reason is a pretext for discrimination. *Id.*

Because an essential element of this claim is that Ms. Borwick was "otherwise qualified" for the program, notwithstanding her disability, this claim fails for the same reason as her failure to accommodate claim fails – according to the Defendants' professional judgment, she was not making sufficient academic progress towards completion of her dissertation, making her unqualified for a fourth extension of time to finish the program.  For this reason alone, the Defendants are entitled to summary judgment on this claim.

Moreover, the Court finds that Ms. Borwick has not alleged circumstances sufficient to give rise to an inference that the Defendants' decision to terminate her from the program (and, implicitly, their decision not to grant her untimely request for an extension of the deadline) was

the result of animus towards her due to disability.  The record reflects that the Defendants were most accommodating, granting her three extensions of the seven-year deadline premised solely based on her claims of disability.  Ms. Borwick identifies no statement by any Defendant reflecting an animus towards persons with disabilities generally, or any made against her because of a disability.  She identifies no able-bodied individuals who received more favorable treatment (*i.e.* more than three years of extensions) than she did.[8]  Finally, as noted earlier, Ms. Borwick's request for a fourth extension of time, besides being untimely, was not premised upon any disability she suffered.  That request mentions Ms. Borwick's own medical reversals, but largely in a historical context.  Its justification was that "I had a family emergency that took me away from my work for two months," and to a lesser degree, general complaints about the lack of support from Dr. Cloud.  Under these circumstances, the Court cannot say that Ms. Borwick has identified any evidence that would permit an inference that the Defendants' decision to terminate her student status and deny her request for a fourth extension was motivated by consideration of her disability.[9]

---

[8]     Ms. Borwick identifies two other students with disabilities that were allegedly provided additional time to pursue their degrees.  However, it is undisputed that these students sought medical stop-outs, rather than extensions.  She mentions a third individual who "had more than three extensions because her daughter had a serious medical illness" who "worked while her daughter was ill," but such a fact does not show that Ms. Borwick was comparatively maltreated.  Instead, it affirms the proposition that the Defendants were, in general, eager to accommodate disabilities.

[9]     As previously noted, Ms. Borwick has appeared to argue that she is not asserting a claim of discrimination premised on her own disability, but rather, is alleging that the Defendants discriminated against her based on her association with other disabled individuals.  Even if the Court were to consider her ability to establish a *prima facie* case of an associational-discrimination claim, Ms. Borwick fails for the reasons discussed previously.  The record contains no indication whatsoever that the decisionmaking Defendants, namely Dr. Wilcots and members of the committee that considered Ms. Borwick's appeal of her termination, ever acknowledged, much less considered, the circumstances of Ms. Borwick's adoptive (or, for that

Accordingly, the Defendants are entitled to summary judgment on Ms. Borwick's claim of intentional disability discrimination.

### E.  Disparate impact

To establish a claim of disparate impact, an individual must show that "a facially-neutral employment practice" operated in such a way that its effects fell more harshly on one group of persons (*i.e.* disabled persons) than on other groups, and that such policy cannot be justified on the grounds of business necessity. *Raytheon Corp. v. Hernandez*, 540 U.S. 44, 52-53 (2003). Such proof usually takes the form of "statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012).

The particular contours of Ms. Borwick's disparate impact claim are difficult to discern, as her brief offers no clear identification of the particular policy or policies she alleges created a disparate effect, nor does she illustrate how a policy operated to favor non-disabled individuals over disabled ones (indeed, she does identify even a single non-disabled comparator).  She provides no statistical evidence whatsoever.  Rather, her discussion of this claim appears to be a litany of complaints about the guidance provided by Dr. Cloud, unexplained assertions that "the medical leave, medical stop out and request for extension accommodations . . . punish [Ms. Borwick for being disabled]," assertions that Ms. Borwick was treated differently from other disabled students because of her race, and various other contentions that fail to coalesce into any coherent articulation of a cognizable disparate impact claim.

---

matter, natural) mother.  Rather, it is evident from the record that those decisions were premised solely upon Ms. Borwick's failure to make satisfactory progress on her dissertation.

Accordingly, the Defendants are entitled to summary judgment on Ms. Borwick's disparate impact claim.

### F.  § 1983 claim

Ms. Borwick concedes that she cannot establish that the Defendants were state actors for purposes of this claim, and thus, dismisses it.

### G.  Retaliation claim

Finally, the Court turns to Ms. Borwick's retaliation claim under both the ADA and the Rehabilitation Act.  The ADA prohibits a person from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C § 12203.  The Rehabilitation Act does not contain express language prohibiting retaliation, but courts have construed it to afford protection against retaliation similar to that of the ADA by operation of 29 U.S.C. § 794(d).[10]  *Jarvis v. Potter*, 500 F.3d 1113, 1125 (10th Cir. 2007).

To establish a claim of retaliation, Ms. Borwick must first demonstrate a *prima facie* case by showing: (i) she engaged in a protected activity; (ii) she suffered an adverse action; and (iii) there is a causal connection between the protected act and the adverse action.  *Reinhardt v. Albuquerque Public Schools*, 595 F.3d 1126, 1131 (10th Cir. 2010).  If she succeeds, the burden

---

[10]     The cited statute relates to "standards [to be] used in determining whether [the Rehabilitation Act] has been violated in a complaint alleging <u>employment</u> discrimination," and invokes the provisions of Title I of the ADA, "as such sections relate to <u>employment</u>."  *Id.* (emphasis added).  The Court is aware of no authority finding a basis for retaliation claims where, as here, a person alleges non-employment-based retaliation for complaining about disability discrimination in public accommodations.  Nevertheless, because the Court finds Ms. Borwick's retaliation claim to be non-viable in any event, the Court will treat it as if cognizable under the Rehabilitation Act, whether under an employment-based scheme or otherwise.

shifts to the Defendants to articulate a non-retaliatory reason for the adverse action, and Ms.

Borwick must ultimately demonstrate that the proffered reason is a pretext for retaliation.  *Id.*

The record reflects only a single complaint of disability discrimination prior to the

decision to terminate her student status in June 2010.  In August 2009, after receiving her third

extension that came with the caveat that no further extensions would be granted, Ms. Borwick

filed a formal complaint with the Department of Education.  That complaint is somewhat

jumbled.  On the one hand, it complains in abstract terms about the "no further extensions"

provision, stating that "I plan to finish the degree but I am filing this action to protect my right

[to] make the discrimination known."  On the other hand, it complains that two other disabled

students "made similar or less progress that I have made, yet they were not given this warning,

[and they] are white and I am African American."  Ms. Borwick also states that "I believe that I

am being discriminated against due to my disability and age," without additional elaboration.

She states that "I believe that judgments have been made regarding my medical and health

concerns that are harmful to me," but again does not explain.  As a remedy, Ms. Borwick

requests that the extension letter (or, perhaps more accurately, the "no further extensions"

language) "be rescinded and a letter of apology issued to me."  She also requests "the names of

people who received [a] letter," apparently referring to a letter that Dr. Cloud wrote to Dr.

Wilcots in conjunction with Ms. Borwick's request for the third extension.  The record reflects

that the Department of Education provided a copy of Ms. Borwick's complaint to the School on

October 19, 2009, but does not disclose any further developments in the matter until Ms.

Borwick wrote to the Department of Education in February 2011, stating that "I was not satisfied

with the results of the original [Department of Education] findings" on her complaint (and states

that she apparently filed an appeal of the Department of Education's conclusions, although the circumstances of that appeal are not known to the Court).[11]

The Court assumes, initially, that Ms. Borwick's August 2009 complaint is the protected activity underlying her retaliation claim. What constitutes the alleged adverse action is slightly less clear. It cannot be the "no further extensions" provision in the third extension, as the granting of that (restricted) extension preceded (and indeed, prompted) Ms. Borwick's complaint. It is fair to assume that Ms. Borwick contends that her termination from the School in June 2010 constituted an adverse action, and the Court will presume additionally that Ms. Borwick contends that the School's inaction on/tacit denial of her request for a fourth extension constitutes an additional adverse action.

However, the Court finds that Ms. Borwick has not demonstrated any causal connection between her protected conduct in August 2009 and the alleged adverse actions taken against her in June 2010. The typical way in which a plaintiff demonstrates a causal connection is by showing that the protected activity and adverse action occurred closely in time, such that the temporal proximity between the two events is sufficient, in and of itself, to give rise to an inference of a causal connection. *O'Neal v. Furguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). However, to suffice, the temporal window must be extremely short; a six-week window has been found sufficient, but a three-month window is, by itself, insufficient to permit an inference of causation. *Id.*

---

[11]    Interestingly, Ms. Borwick's February 2011 letter explains that "I filed my case on race and age discrimination. The real focus of my complaint had to do with how my disabilities were dealt with differently from my Caucasian colleagues."

Here, even if the Court were to measure the temporal window from the October 19, 2009 date on which the School was apparently notified of Ms. Borwick's complaint, more than seven months passed between that date and the date on which Ms. Borwick's student status was terminated.   Because the temporal window is too wide to support an inference of causation, Ms. Borwick must come forward with some other evidence that would suggest a causal link.  *Id.*  She has not done so.  Nothing in the record indicates that any official of the School ever spoke to Ms. Borwick about the complaint, or that any Defendant spoke of the complaint in the course of making the decisions that were made in June 2010.  Without some evidence of the Defendants' contemplation of the Department of Education complaint in or about June 2010, Ms. Borwick cannot establish a *prima facie* claim of retaliation based on that complaint.

Ms. Borwick's brief appears to posit an entirely different theory of the retaliation claim.  She suggests that the adverse action was the "no further extensions" clause of the third extension, and the protected conduct giving rise to that action was her "persistence in removing Dr. William Cloud as her dissertation chair."  However, the fact that Ms. Borwick sought to remove Dr. Cloud as her dissertation chair is not (at least on the record presented here, which discloses only academic dissatisfaction with Dr. Cloud as the reason for that decision) protected activity under the ADA or Rehabilitation Act.  It is not, for example, "oppos[ition] any act or practice made unlawful by" the ADA, nor is it activity in connection with "an investigation, proceeding, or hearing under" the ADA.  Even assuming that Ms. Borwick's <u>subjective</u> motivations for removing Dr. Cloud as her dissertation advisor bore some connection to her disability, there is no indication that she conveyed that connection to the Defendants.  Rather, the record reflects that she conveyed to the Defendants that she "like[d Dr. Cloud] a lot" but "would prefer to work with

someone else who is interested in me as a student and in my work."  If the Defendants were unaware that Ms. Borwick's decision to change advisors was based on anything having to do with her disability, the Defendants could not possibly have retaliated against her for engaging in activity protected by the ADA.

Accordingly, the Court finds that the Defendants are entitled to summary judgment on Ms. Borwick's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(# 58)** is **GRANTED**  in its entirety.  The Clerk of the Court shall enter judgment in favor of the

Defendants and against Ms. Borwick on all claims in this action.  The Defendants' Motion to

Strike (# **71**) Ms. Borwick's affidavit is **DENIED**.

Dated this 18th day of March, 2013.

**BY THE COURT:**

_Marcia S. Krieger_

_____

Marcia S. Krieger
Chief United States District Judge